OPINION OF THE COURT
Harold Baer, Jr., J.
This is a motion to dismiss the complaint under the two-year Statute of Limitations of the Warsaw Convention (the Convention), and a cross motion to compel discovery of certain documents.
On August 20,1976, plaintiff Josephine Rullman[1] held a ticket on defendant’s international flight C207 from Ciompino Airport in Rome to New York, with a scheduled one-hour stopover in Shannon Airport in Ireland. She arrived at the airport in Rome at approximately 9:00 a.m., presented her ticket at the check-in counter, was checked in and checked her baggage. The plane finally departed after an eight-hour delay, during which time plaintiff became ill while in the airport terminal waiting room. The terminal waiting room, which was also used by passengers awaiting departure on other flights, was overcrowded, had an inadequate number of seats — forcing the plaintiff to stand *446 much of the time — had unsanitary restrooms and one small bar at which to buy food and drink. Plaintiff contends that she became ill with a severe migraine headache and nausea during this delay because of these inadequate terminal facilities.
After the two-hour flight to Shannon, plaintiff disembarked and sat in the terminal by a windowsill located in a common corridor. During the ensuing wait, she tried unsuccessfully to obtain medical treatment at an infirmary. After approximately a three-hour delay in Shannon, an announcement was made informing the passengers that their plane was disabled and they would not continue their flight to New York until the following morning. The passengers were told to retrieve their personal belongings from the airplane, after which they would be taken to a hotel for the night.
Approximately 10 feet from the door of the aircraft on the jet way connecting the terminal and the plane, plaintiff fainted and fell, suffering injury to her knee for which she seeks damages in this action. Plaintiff attributes her fainting, and subsequent fall, to weakness and fatigue caused by defendant’s failure to provide reasonable amenities and services while she was delayed in the terminals of Ciompino and Shannon Airports. Specifically, she complains that during the eight-hour delay in takeoff from Rome and in the three-hour delay at Shannon, Pan Am failed to provide her with food, drink or adequate rest or medical facilities.
An examination before trial was taken of Pan Am flight attendant Lorraine Skalko, who was present at Shannon Airport. Ms. Skalko did not see plaintiff fall, nor does she know the exact location of the fall. An accident report, if any, would have been made by the head flight attendant, not Ms. Skalko; she also identified numerous other documents which may have some bearing on the issues in this case.
The defendant moves for summary judgment on the ground that plaintiff’s fall on the jetway, approximately 10 feet from the aircraft, occurred “in the course of any of the operations of embarking or disembarking” within the *447 meaning of the Convention.[2] This action, it concludes, brought two and one-half years after the occurrence, is barred by the Convention’s two-year Statute of Limitations (49 US Stat 3000, 3021 [art 29]). I disagree.
The gravamen of the complaint is that Pan Am’s negligent operation of the terminal waiting rooms at Ciompino and Shannon Airports caused plaintiff to faint and fall on the jetway. There is no allegation in the complaint that Pan Am negligently operated the jetway; that is, there is no claim, for example, that she fell because she tripped while in the course of embarking.
In order to come within the purview of the Convention, the proponent of such coverage must prove (1) that an accident occurred (2) while the passenger was embarking or disembarking the aircraft. (Day v Trans World Airlines, 528 F2d 31, cert den 429 US 890.)
The defense argues that a literal reading of article 17 (49 US Stat 3000, 3018) mandates a finding that the incident charged in the complaint is within the scope of the Convention. First, the defendant contends there was an accident — plaintiff fainted and fell on the jetway; next, the accident occurred in the course of the operation of embarking or disembarking. A close review of the facts and the law reveals that defendant’s position on both scores (i.e., that this was an accident within the Convention and that it occurred in the course of the operation of embarking or disembarking) must fail.
Turning first to the term “accident,” under the Convention, courts have required that a passenger incident involve some risk connected with aviation — as opposed to any other mode of transportation — before finding an “accident” occurred within the meaning of that article. In Warshaw v Trans World Airlines (442 F Supp 400), the court defined the term “accident” as follows: “To constitute an accident, the occurrence must be an unusual or unexpected happening * * * The event or occurrence is not an accident if it results solely from the state of health of the *448 passenger and is unconnected with the flight.” (442 F Supp, at p 412; citations omitted; emphasis supplied.) (See, e.g., MacDonald v Air Canada, 439 F2d 1402 [plaintiff fell while standing in the baggage claim area of the terminal after an international flight; no proof that fall was connected to the flight]; DeMarines v KLM Royal Dutch Airlines, 580 F2d 1193 [no evidence of ear damage due to unusual occurrence during flight].)
Additional support for the proposition that an “accident” within the meaning of the Convention must be connected with some risk peculiar to air travel is illustrated by the drafting history of the Convention.
Three proposals governing the scope of a carrier’s liability to passengers were the focus of the Warsaw debate: first, liability would extend from the moment the traveler enters the aerodrome[3] of departure, and continue up to the moment when he leaves the aerodrome of destination (Mins., pp 67-G8);[4] second, liability would commence only when the traveler has taken his place on board the aircraft (Mins., p 71) and third, liability would begin once the contract of carriage commences (Mins., p 75).
The aerodrome-to-aerodrome principle of liability was criticized for exposing the carrier to liability for the acts of third persons unrelated to any risk of air navigation, such as injury occurring to a passenger in an airport restaurant (Mins., p 72). On the other hand, limiting liability until the passenger was on board, was found to exclude common hazards of aviation such as injury to a passenger while walking along the apron from the terminal to the plane. (Mins., pp 78, 81.) In 1929, when the Convention was drafted, passengers were exposed to the dangers of spinning airplane propellers and taxiing aircraft from the instant the terminal was left. Today, the major air terminals provide extensions (jetways) from the terminal to the plane’s interior, eliminating what was once a major hazard of air travel.
*449 The Convention drafters compromised on a fourth proposal, and adopted the language of article 17, “on board the aircraft or in the course of any of the operations of embarking or disembarking.”
Commentators have acknowledged that the Convention is limited to covering the hazards of flying and was never intended to apply to the traditional risks undertaken by a common carrier. (See, e.g., Note, Warsaw Convention — Air Carrier Liability For Passenger Injuries Sustained Within A Terminal, 45 Fordham L Rev 369, 384-385.)
As one commentator observed: “An international convention is not necessary to govern the liability of an air line company in its capacity as waiting-room proprietor * * * If the airport waiting-room is maintained by the carrier, is an injury sustained therein by a passenger within the terms of the Convention? The passenger is present there for the purpose of embarkation. But again the purpose of the convention must be considered; no hazard peculiar to air navigation has been encountered. To permit the air carrier to limit his liability as a waiting-room operator would be a discrimination against every operator of railway or bus passenger stations.” (Sullivan, The Codification of Air Carrier Liability by International Convention, 7 J Air L 1, pp 20-21 [1936].)
Evangelinos v Trans World Airlines (550 F2d 152), the only case cited by the defendant, is clearly distinguishable. In that case, the court found the passengers were victims of a terrorist attack within the terminal, and held that the resultant injuries were a risk inherent in modern air travel and that such attack was an “accident” within the meaning of article 17. In Day v Trans World Airlines (supra), a case identical to Evangelinos arising out of the same incident, the Second Circuit also found that the terrorist attack was one of the modern risks of aviation covered by the Convention (528 F2d, at pp 33, 38). Here, there is no contention that plaintiff’s injury was a risk inherent in modern air travel, ergo the occurrence does not constitute an “accident” under the Convention.
Even if one were to assume there was an “accident,” it is clear that at the time Pan Am is alleged to have breached its duty to the plaintiff, she was not in the course of the *450 operations of embarking or disembarking. During the eight-hour delay after checking in at Ciompino Airport, she was not imminently preparing to board the plane, was free to move about the terminal and was not under the direction of the airline personnel. Indeed, one of plaintiff’s concerns is that there were no Pan Am personnel available to help her through her illness.
In Schmidkunz v Scandinavian Airlines System (628 F2d 1205), a traveler who had disembarked at Copenhagen’s Kastrup Airport from an airliner from the United States was injured on a moving walkway in the passenger terminal, located 500 yards from the boarding gate of the connecting flight on SAS that she was to take. The injured party invoked the Convention against SAS under the theory that she was embarking. The Ninth Circuit found that the facts did not support that theory: “She had not received her SAS boarding pass, was not imminently preparing to board the plane, and was not at * * * [the] time under the direction of SAS personnel.” (628 F2d, at p 1207.)
By contrast, in Evangelinos (supra), the passengers had completed all the procedures required for boarding save for the weapon search and physically walking from the search area to the aircraft, some 250 meters away. Two terrorists fired upon and lobbed hand grenades into the vicinity of the TWA passengers who were found to be embarking.
Here, in Shannon Airport terminal — the other location of the alleged negligent conduct — plaintiff had completed disembarkation and was free during the three-hour delay to visit the terminal infirmary, which she did, and wander, unrestricted, through part of that building.
In an analogous situation to the case at bar, Felismina v Trans World Airlines (1974 US Av R 537 [USDC, SONY]), the court denied the airline’s motion for summary judgment based on the Convention’s Statute of Limitations, and held the Convention did not apply because the plaintiff had finished disembarking when she fell on a terminal escalator. (Accord Maugnie v Compagnie Nationale Air France, 549 F2d 1256, cert den 431 US 974 [accident in common passenger corridor no longer disembarkation].)
Accordingly, Pan Am’s contention that the injury was sustained during embarking or disembarking is unsub *451 stantiated. Had plaintiff simply tripped on a carpet in the jetway and injured herself and that constituted the gravamen of the complaint, defendant’s claim that she was injured while embarking might be meritorious. Even though the plane was out of service, an argument could be made that while she was boarding the plane at the direction of the defendant, she was within the ambit of the Convention. However, in the instant case, the injury suffered was — according to the complaint — a result of the lack of waiting room facilities, which occurred before the plaintiff walked down the jetway to retrieve her belongings. Plaintiff’s fainting and fall were unconnected to the flight itself, or so it is alleged, and, thus, are outside the pale of the Convention.
In the instant case, viewing the facts in the light most favorable to the plaintiff, as I am bound to do, the motion for summary judgment must be denied. There is at least a reasonable view of the facts to the effect that plaintiff’s injury was not connected to the flight but was proximately caused by Pan Am’s failure to guard against the risks of negligently maintained terminal facilities during extended periods of delay.
Plaintiff cross-moves to compel production of certain documents requested of defendant during the deposition of Ms. Skalko and not yet produced. Among the items requested were the in-flight log book, the 1976 Flight Service Handbook, the passenger manifest list for the flight leaving Ciompino Airport and a list of supplies for that flight. Although the requested information was reasonably specific, defendant is not required to comply with plaintiff’s request until served with a notice of discovery and inspection pursuant to CPLR 3102. “[A] party seeking discovery and inspection should initially make use of the deposition and related procedures provided for in the CPLR to ascertain the existence of the appropriate documents and then serve a notice of discovery”. (Butler v District Council 37, 72 AD2d 720, 721.)
Since defendant has indicated in its papers that it is willing to comply with a notice of discovery and inspection pursuant to CPLR, it hardly seems onerous to require plaintiff to make such a request in a proper manner, before *452 resort to the courts. Plaintiff’s cross motion is therefore denied. Plaintiff will serve its notice of discovery and inspection for such documents within 10 days of publication of this order in the New York Law Journal.

. Unless otherwise indicated, the singular “plaintiff” refers to Josephine Rullman. Edward Rullman, her husband, sues for damages due to the lost services and companionship of his wife. For purposes of this motion, the husband’s claim will be controlled by his wife’s claim.

. Article 17 of the Convention states: “The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.” (49 US Stat 3000, 3018.)

. In 1929, the term “aerodrome” meant the entire airfield property on which there were several buildings used by passengers. (Evangelinos v Trans World. Airlines, 550 F2d 152, 158, n 11.)

. Minutes, Second International Conference on Private Aeronautical Law (1929, Warsaw), Horner & Legrez Translation, 1975 (hereinafter Mins.).